J-S72001-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: K.N.B., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.W., MOTHER | No. 1263 EDA 2017 |

Appeal from the Order Entered March 20, 2017
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):
CP-51-AP-0000058-2017
CP-51-DP-0000884-2015

| | |
|---|---|
| IN THE INTEREST OF: K.N.W., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.W., MOTHER | No. 1267 EDA 2017 |

Appeal from the Order Entered March 20, 2017
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):
CP-51-AP-0000059-2017
CP-51-DP-0000838-2015

BEFORE: BENDER, P.J.E., MUSMANNO and STEVENS, P.J.E.*

MEMORANDUM BY BENDER, P.J.E.:             **FILED JANUARY 19, 2018**

C.W. (Mother) appeals from the March 20, 2017 orders that granted the petitions filed by the Philadelphia Department of Human Services (DHS) to involuntarily terminate her parental rights to K.N.B. (born in February of 2006) and K.N.W. (born in September of 2012) (collectively Children).[1] Additionally, the goals for Children were changed to adoption. We affirm.

---

[1] Mother's appeals were consolidated by this Court *sua sponte* by order dated May 9, 2017.

*Former Justice specially assigned to the Superior Court.

In its opinion, the trial court set forth the factual and procedural history of this case, as follows:

On September 25, 2012, the Department of Human Services (DHS) received a General report which stated that K.N.B. and K.N.W's mother tested positive for marijuana and cocaine at K.N.[W.]'s birth [i]n September [of] 2012. The report stated Mother admitted using marijuana regularly during her pregnancy but denied cocaine use. K.N.[W.] was born three weeks premature at 36 weeks gestation and weighed four pounds and ten ounces. The report stated in early September 2012, Mother was admitted to the hospital suffering from preterm labor; Mother tested positive for marijuana at that time. Mother was referred to Chances drug and alcohol treatment program and did not follow through with the drug and alcohol treatment. The report stated K.N.B. was being cared for by [C]hildren's Maternal … Grandmother while Mother was hospitalized. Mother and K.N.B. and K.N.W resided with Grandmother. Mother agreed to accept Child Abuse Prevention and Treatment Act (CAPTA) services and was referred for community-base[d] prevention services with Health Federation implementing voluntary services.

On April 1, 2015, DHS received a General Protective Services (GPS) report which alleged that the Philadelphia Police responded to a disturbance complaint at Mother's residence. Mother was observed to be unresponsive and under the influence of heroin. The report alleged [] it took Philadelphia Police seven minutes to revive Mother to a conscious state. K.N.W was in Mother's care. The report alleged Mother resided in [a] rooming house and there were two additional adults in the room who were under the influence of narcotics. The report indicated the room was unkempt. K.N.W. was clothed in only a diaper and was without adult supervision. The report further alleged once Mother regained consciousness, she was observed by Philadelphia Police picking up K.N.W. by his hair [and] attempting to flee the room. The report was determined to be valid.

On April 1, 2015, DHS received a supplemental report which alleged Mother escaped the rooming house and took K.N.W. to Maternal Grandmother's home. Police located K.N.W. at Maternal [G]randmother's home and transported both to DHS.

DHS spoke with Maternal Grandmother, who stated she was willing and able to care for K.N.W. and did not believe Mother was capable of caring for K.N.W. The report alleged K.N.B. had been in her care for three years. DHS discussed kinship services with Maternal Grandmother.

On April 1, 2015, DHS completed a home evaluation of Grandmother's home and found the home to be compliant for K.N.B. and K.N.W. DHS obtained an Order of Protective Custody (OPC) for K.N.W. and placed him with Grandmother.

At the Shelter Care hearing for K.N.W. held on April 3, 2015, the [c]ourt lifted the OPC and ordered the temporary commitment of custody of K.N.W. to DHS to stand.

On April 6, 201[5], DHS filed an urgent petition for K.N.B.

Mother had a history of drug use and lacked stable and appropriate housing.

On April 13, 2015, the [c]ourt deferred adjudication, ordered the temporary commitment to DHS to stand as to K.N.W., ordered Mother was not permitted to visit K.N.W. and K.N.B. in the home of Maternal Grandmother. The [c]ourt further ordered Mother to the Clinical Evaluation [Unit] (CEU) for a drug screen, assessment and monitoring with dual diagnosis.

At the Adjudicatory Hearing held on April 20, 2015, the [c]ourt discharged the temporary commitment on K.N.W. The [c]ourt adjudicated K.N.B. and K.N.W. dependent and committed [C]hildren to DHS. The [c]ourt further ordered DHS to refer Mother for a GED program, re-referred Mother to CEU for a drug and alcohol screen, assessment with dual diagnosis, [and] monitoring. Mother was ordered to sign releases, to comply with all services and recommendations. Mother was also court-ordered … to continue treatment at Best Behavioral Health.

On May 26, 2015, an initial Single Case Plan (SCP) was created. The objectives for Mother were to achieve recovery from drug[s] and alcohol, to continue at NHS three times a week for individual and group therapy, to continue at Best Behavioral Health for individual therapy once a week, to provide stable housing, to attend the Achiev[]ing Reunification Center (ARC) and comply with the program, to maintain the relationship with [C]hildren, to

continue supervised visits at the agency twice a month, to achieve age appropriate development and skills and to continue with ChildLink services twice a week in the home for speech therapy.

On July 13, 2015, the [c]ourt referred Mother to CEU for an assessment and a drug screen with three random drug screens prior to the next court date.

On September 1, 2015, a revised SCP was created. The objectives for Mother were to achieve recovery from drug[s] and alcohol; to continue at NHS three times a week for individual and group therapy; to continue at Best Behav[ioral] Health for individual therapy once a week; to maintain a relationship with [C]hildren; to continue supervised visits at the agency twice a month; to achieve age-appropriate development and skills[;] and to continue with Childlink services twice a week in the home for speech therapy.

On October 6, 2015, it was reported that on September 22, 2015 Mother tested positive at NHS for marijuana. The Court referred Mother to CEU for a full drug and alcohol screen and three randoms prior to the next court date.

On February, 26, 2016, a revised SCP was created. The objectives [were] for Mother to achieve recovery from drug and alcohol[;], to continue at NHS three times a week for individual and group therapy; to maintain a relationship with her children; to continue with unsupervised liberal visits; to provide stable housing[;] to stabilize her mental health and to continue individual therapy once a week at Best Behavioral Health.

On March 22, 2016, the [c]ourt referred Mother to CEU for [a] drug screen and monitoring to include three random drug screens prior to the next court date, and ordered that visitation with Mother was modified to supervised visits.

On June 23, 2016, it was reported that there had been no compliance with the permanency plan by Mother. The [c]ourt ordered Mother to have supervised visits at DHS only, [and] ordered Mother [to] confirm visits 24 hours in advance. The [c]ourt further ordered Mother was not permitted unauthorized contact with K.N.B. and K.N.W. Mother was re-referred to CEU

for drug and alcohol screens, assessments, dual diagnosis monitoring, and three random drug screens.

On November 17, 2016, it was reported there had been minimal compliance with the permanency plan by Mother. The [c]ourt ordered Mother to call and confirm her visits 24 hours in advance. The [c]ourt referred Mother to CEU for monitoring, dual diagnosis and three random drug screens.

The matter was the listed on a regular basis before judges of the Philadelphia Court of Common Pleas, Family Court Division-Juvenile Branch pursuant to section 6351 of the Juvenile Act, 42 Pa.C.S.[] § 6351, and evaluated for the purpose of reviewing the permanency plan of [Children].

In subsequent hearings, the Dependency Review Orders reflect the [c]ourt's review and disposition as a result of evidence presented, primarily with the goal of finalizing the permanency plan.

On March 20, 2017, during the Termination of Parental Rights Hearing for Mother, the [c]ourt found by clear and convincing evidence that Mother's parental rights [to] K.N.B. and K.N.W.[] should be terminated pursuant to the Juvenile Act. Furthermore, the [c]ourt held it was in the best interest of [C]hildren that the goal be changed to Adoption.

Trial Court Opinion (TCO), 8/16/17, at 1-3.

In its opinion, the trial court also discussed the basis for its decision to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8) and (b), and to change the goal to adoption. It sets forth facts gleaned from the documentation and testimony presented at the March 20, 2017 hearing and suggests that this Court should affirm its decision.

In Mother's brief, she raises the following issues for our review:

1. Did the [t]rial [c]ourt err in terminating [Mother's] parental rights under 23 Pa.C.S. Section 2511(a)(1), 2511(a)(2), 2511(a)(5), and 2511(a)(8)?

2. Did the [t]rial [c]ourt err in finding that termination of [M]other's parental rights best served the [Children's] developmental, physical and emotional needs under 23 Pa.C.S. Section 2511(b)?

3. Did the [t]rial [c]ourt err in changing the [C]hildren's goal to adoption?

Mother's brief at vi.

We review an order terminating parental rights in accordance with the following standard:

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (quoting *In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005)). Moreover, we have explained that:

The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* (quoting *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve

conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004). If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result. *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa. Super. 2003).

We are guided further by the following: Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511, other citations omitted). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *R.N.J.*, 985 A.2d at 276.

With regard to Section 2511(b), we direct our analysis to the facts relating to that section. This Court has explained that:

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and

emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.* However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id.* at 763.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

As noted above, the trial court terminated Mother's parental rights pursuant to section 2511(a)(1), (2), (5), (8) and (b). In order to affirm, we need only agree with the trial court as to any one subsection of section 2511(a), as well as section 2511(b). *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Mother's brief provides argument regarding all four subsections of section (a). We have chosen to address and analyze the court's decision to terminate Mother's parental rights under section 2511(a)(1) and (b), which provide:

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

* * *

- 8 -

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b).

In ***In re Z.P.***, 994 A.2d 1108 (Pa. Super. 2010), this Court provided direction relating to what considerations need to be addressed when reviewing a trial court's decision to terminate parental rights under various subsections of 2511(a). Specifically, relating to subsection (a)(1), the ***Z.P.*** Court stated:

A court may terminate parental rights under Section 2511(a)(1) where the parent demonstrates a settled purpose to relinquish parental claim to a child **or** fails to perform parental duties for at least the six months prior to the filing of the termination petition. ***In re C.S.,*** [761 A.2d 1197 (Pa. Super. 2000)]. The court should consider the entire background of the case and not simply:

mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his … parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

***In re B.,N.M.,*** 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied,* 582 Pa. 718, 872 A.2d 1200 (2005) (citing ***In re D.J.S.,*** 737 A.2d 283 (Pa. Super. 1999)).

*In re Z.P.*, 994 A.2d at 1117 (emphasis in original).

Relating to Mother's argument addressing subsection (a)(1), her brief simply provides a recitation of the law and then she claims the following:

> In this case, [M]other had consistently visited with the [C]hildren. Mother was active in mental health treatment, and she had attended drug and alcohol treatment until it interfered with her work times. Mother was employed full time and had housing. In addition, [M]other's drug screens were negative.

Mother's brief at 4.

In discussing the facts relating to section 2511(a)(1), the trial court stated:

> In the instant matter, the social worker testified the case became known to the agency due to a visit to Mother's home by Philadelphia Police. The social worker testified Mother was found unconscious by the Philadelphia Police. K.N.W. was found by the Philadelphia Police walking around unattended.

> Social worker testified Mother was offered and failed to be consistent with drug and alcohol treatment and mental health treatment. Social worker testified Mother failed to attend Clinical Evaluation Unit (CEU) for random drug screens as per court order. Mother admitted in her testimony, she failed to comply with the court ordered drug screens at CEU. Mother had not participated in drug screens in over a year. Furthermore, social worker testified Mother's last screen tested positive high for alcohol. Mother testified she refused to take prescribed medication for depression.

>                    . . .

> In the present matter, during the twenty three months (23) K.N.B. and K.N.W. have been in DHS care, testimony of social worker stated Mother's Single Case Plan objectives remained the same due to lack of progress. Furthermore, social worker testified Mother failed to provide verification of completion or progress in any kind of drug, alcohol or mental health treatment. However, Mother participated in visits only missing a few visits.

- 10 -

TCO at 4, 5 (citations to the notes of testimony omitted). Essentially, the trial court found that Mother failed to complete most of the objectives during the two-year period, in particular, those dealing with her drug, alcohol and mental health problems, although she did comply with the visitation objective. Notably, the court found the social worker credible, but that Mother's testimony lacked credibility.

Likewise, with regard to Mother's second issue, relating to subsection 2511(b), Mother sets forth the applicable law, but merely relies on the fact that she complied with the visitation schedule with Children and that those visits "were appropriate." Mother's brief at 7. However, the court found that Children were "dependent on and bonded with their foster parent[;]" that Children's "basic needs were being met by their foster parent[;]" and that Children "would suffer no irreparable harm if Mother's rights were terminated." TCO at 6.

Our thorough review of the record reveals that the trial court did not abuse its discretion in ordering the termination of Mother's parental rights. The record supports the court's findings and conclusion that Mother's refusal or failure to perform parental duties occurred for a period of at least six months (in fact, for at least 23 months) prior to the filing of the petition. Moreover, the evidence shows that Children have bonded with foster parent, who satisfies their needs, and "is the focal point of stability and permanency for Children." *Id.* at 6. Additionally, we note that a child's life "simply

- 11 -

cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *In re Z.S.W.*, 946 A.2d. 726, 732 (Pa. Super. 2008) (citation omitted). "[A] parent's basic constitutional right to the custody and rearing of [his or her] child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d at 856. Since Mother has not convinced us otherwise, we conclude that she is not entitled to any relief.

Lastly, we address Mother's third issue concerning the goal change to adoption for Children. The trial court determined that based on the record a goal change to adoption was in Children's best interests. Mother again set forth the law relating to a goal change and then simply argues that:

> Mother was complying with her FSP objectives. Moreover, [M]other had always visited with the [C]hildren throughout the life of this case. The [C]hildren looked to [M]other for comfort, security, love and support. It is in these [C]hildren's best interest to be with their [M]other, and the goal should not have been changed to adoption.

Mother's brief at 8.

This Court's standard of review involving a goal change for a dependent child is as follows:

> In cases involving a court's order changing the placement goal … to adoption, our standard of review is abuse of discretion. *In re N.C.*, 909 A.2d 818, 822 (Pa. Super. 2006). To hold that the trial court abused its discretion, we must determine its judgment was "manifestly unreasonable," that the court disregarded the law, or that its action was "a result of partiality, prejudice, bias or ill will." *Id.* (quoting *In re G.P.-R.,* 851 A.2d

- 12 -

967, 973 (Pa. Super. 2004)).  While this Court is bound by the facts determined in the trial court, we are not tied to the court's inferences, deductions and conclusions; we have a "responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record."  **In re A.K.**, 906 A.2d 596, 599 (Pa. Super. 2006).  Therefore, our scope of review is broad.  **Id.**

**In re S.B.**, 943 A.2d 973, 977 (Pa. Super. 2008).

Pursuant to the Juvenile Act, 42 Pa.C.S. § 6351(f), when considering a petition for goal change for a dependent child, the juvenile court is to consider, *inter alia*: (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; and (5) a likely date by which the goal for the child might be achieved.  **In re S.B.**, 943 A.2d at 977.  The best interests of the child, and not the interests of the parent, must guide the trial court.  **Id.** at 978

Our review of the record in this case and the statutory directives governing a goal change support the conclusion that reunification of Children with Mother is not a realistic goal.  Mother is primarily seeking to have this Court reweigh the evidence in a light more favorable to her.  However, it is beyond our purview to disturb the credibility determinations of the trial court when the testimony relied upon is supported in the record.  The trial court was free to conclude that Mother was unlikely to remedy the issues in the

near future; thus, the permanency needs of Children dictate changing their goal to adoption. We are compelled to conclude that the trial court did not err in ordering the change of goal to adoption.

Orders affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 1/19/2018*